UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PATRICIA CORDNER,

                       Plaintiff,

        – against –

MARIST COLLEGE and DEBORAH DICAPRIO,

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPLAINT**

Case No. _____

Jury Trial Requested

Plaintiff Patricia Cordner, by and through her attorneys, Sapir Schragin LLP, for her Complaint against Defendants alleges as follows:

**PRELIMINARY STATEMENT AS TO NATURE OF ACTION**

1.    Plaintiff Patricia Cordner is the former Assistant Dean for Student Affairs for Defendant Marist College ("Marist" or the "College"). Ms. Cordner worked for the College for 17 years, always "exceeding expectations" in her job performance. Yet, despite Ms. Cordner's stellar record and invaluable contributions to the College, the College terminated her employment on August 26, 2019, under highly suspicious circumstances that raised the specter of age discrimination.

2.    In the summer of 2019, Defendant Deborah DiCaprio, Marist's Vice President and Dean for Student Affairs, made it abundantly clear that she wanted to bring in a younger staff – the alleged "future" of the Division – and hoped that Ms. Cordner would resign from her position at the College soon.

3. On June 4, 2019, Defendant DiCaprio advised Ms. Cordner that her job performance for the year had "exceed[ed] expectations." At the same time as she praised Ms. Cordner's work, however, Ms. DiCaprio delivered a lengthy tirade of discriminatory and disparaging remarks to Ms. Cordner, based on her age, including "I know how old you are so when are you planning to go?" "why don't you just leave?" "we need to plan for the future and find younger people," that Ms. Cordner "would not be here soon" and that "it's time for the young staff to take over." The discriminatory animus laid bare by Ms. DiCaprio presaged her decision to end Ms. Cordner's employment when the opportunity fortuitously arose weeks later. That opportunity was a complaint brought against Ms. Cordner based on allegations that date back to 2015. Only after Ms. DiCaprio decided she wanted to get rid of Ms. Cordner, did this employee suddenly come forward to complain after not having said a word during the previous 4 years.

4. This "complaint" and the subsequent "investigation" became the pretext for the decision to terminate Ms. Cordner's employment because of her age – the outcome that Ms. DiCaprio had been seeking when she encouraged and pressured Ms. Cordner to resign. Without consideration of her legal obligations or those of the College, Defendant DiCaprio got rid of Ms. Cordner, and threw away her invaluable and irreplaceable years of experience, expertise and institutional knowledge because she wanted younger employees. Such conduct was unlawful.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims are brought pursuant to a federal statute, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.

6. The Court has supplemental jurisdiction over Ms. Cordner's claims under the New York State Human Rights Law ("NYSHRL") pursuant to 28 U.S.C. § 1367(a). The state law

claims are so closely related to Ms. Cordner's federal claims as to form the same case or controversy.

7. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because Plaintiff worked for Defendants in Poughkeepsie, in Dutchess County, New York, within the Southern District of New York. Defendants conduct business in Poughkeepsie, New York, and the acts and omissions giving rise to the claims alleged took place in Poughkeepsie, New York within this District.

8. On or about March 12, 2020, Ms. Cordner filed a Charge of Discrimination against the College with the United States Equal Employment Opportunity Commission, within 300 days of the date that the College terminated Ms. Cordner's employment. Ms. Cordner alleged that the termination of her employment was unlawful in that it was based on her age.

9. On or about August 18, 2020, the EEOC closed Ms. Cordner's case and issued a Right to Sue Letter to her.

10. The Complaint in this action is being filed with this Court within ninety days of Ms. Cordner's receipt of the Right to Sue letter issued by the EEOC on or about August 18, 2020.

## THE PARTIES

11. Plaintiff Patricia Cordner resides in Poughkeepsie, New York. She was employed by the College from 2017 until August 26, 2019. At the time of the termination of her employment, she was nearly 67 years old.

12. At all relevant times, Ms. Cordner was an employee within the meaning of the ADEA and the NYSHRL.

13. Defendant Marist College is a private liberal arts college in Poughkeepsie, New York. At all relevant times, Marist College was an employer within the meaning of the ADEA and the NYSHRL.

14. At all relevant times, Defendant DiCaprio was the Vice President and Dean for Student Affairs for the College, and Ms. Cordner's direct supervisor. As such, she was an employer within the meaning of the NYSHRL.

## STATEMENT OF FACTS

15. Ms. Cordner is the former Assistant Dean for Student Affairs for Marist College. In that role, she was responsible for several departments – Student Health Services, Student Counseling Services, the Office of Student Conduct, College Activities and First Year Programs. Demonstrating the breadth of her role at the school and the high regard to which she was held, at the time of the termination of her employment, she was also supervising another department - the School's Office of Accommodations and Accessibility. The Office of Accommodations and Accessibility was in a different building than Ms. Cordner's other departments and she split her time between the two buildings on campus.

16. After Ms. Cordner had worked for 17 years for the College, the College terminated her employment on August 26, 2019. The facts and circumstances surrounding the College's termination decision lead to the inescapable conclusion that Ms. Cordner's age was the reason for the decision.

17. As referred to above, on June 4, 2019, Ms. Cordner met with her direct supervisor, Ms. DiCaprio to discuss her annual review. As always, Ms. Cordner's performance was rated as "exceeds expectations." Ignoring Ms. Cordner's continued excellent job performance, Ms.

4

DiCaprio instead took the opportunity to launch a lengthy tirade of discriminatory and disparaging age-based comments against Ms. Cordner, including:

- She told Ms. Cordner that "I know how old you are so when are you planning to go?"

- She wrongly concluded that Ms. Cordner "does not seem happy" and repeatedly asked: "why don't you just leave?"

- She then proceeded to tell Ms. Cordner that "we need to plan for the future and find younger people," that Ms. Cordner "would not be here soon" and that "it's time for the young staff to take over;" and

- She even commented that there are "older" staff [presumably including Ms. Cordner] that need to make room for the "younger" staff.

18. This was not the first time Ms. DiCaprio had made it clear to the staff that she wanted to bring in younger staff who were the "future" of the Division. In fact, she had repeated the statement at numerous staff meetings, despite its blatant bias against older employees.

19. At the time of these remarks, Ms. Cordner was nearly 67 years old.

20. Ms. DiCaprio did not hide her discriminatory animus towards Ms. Cordner because of her age, nor did she hide the fact that she wanted to get rid of Ms. Cordner and replace her with a younger employee. Ms. Cordner, however, refused to resign despite the pressure, hostility and discriminatory animus

21. Ms. DiCaprio's comment that Ms. Cordner "would be gone soon" was more than an offhand premonition. The opportunity for Ms. DiCaprio to act on her discriminatory animus soon presented itself. On June 24, 2019, approximately 3 weeks after Ms. DiCaprio's age-based tirade against Ms. Cordner and Ms. Cordner's refusal to resign, the Office of Human Resources received a complaint about Ms. Cordner's conduct. Deborah Reeves-Duncan, an Assistant Director in the Office of Accommodations and Accessibility, had lodged a complaint about Ms. Cordner concerning her alleged misconduct in 2015, specifically accusing her of creating a hostile

work environment. The complaint provided the pretext that Ms. DiCaprio needed to take adverse action against Ms. Cordner because of her age and act on her promise that Ms. Cordner would be gone soon.

22. The timing of the complaint is highly suspicious as it came weeks after Ms. DiCaprio showed her true colors and intent to get rid of Ms. Cordner. None of the allegations in the complaint were based on timely or recent conduct by Ms. Cordner. Yet, less than three weeks after Ms. DiCaprio had laid bare her bias and contempt for Ms. Cordner and repeatedly asked her when she would be leaving the school, a complaint suddenly materialized concerning conduct that occurred more than four years in the past. Without more, the temporal proximity between the events strongly suggests a connection between them.

23. On July 12, 2019, Ms. Cordner was notified of the complaint, and her employment was suspended pending completion of an investigation into the complaint.

24. At approximately the same time, Ms. Duncan was engaging in a "whispering campaign" against Ms. Cordner, suggesting that the termination of Ms. Cordner's employment was imminent.

25. The conduct of the investigation was highly questionable. In this regard, the College completely deviated from its own procedures and generally accepted practices for conducting a fair and objective investigation. Such significant deviations strongly indicate the College was constructing the smokescreen – the pretext – to hide its true discriminatory motivations for taking adverse action against Ms. Cordner.

26. The procedural deficiencies and infirmities in the College's investigatory process deprived Ms. Cordner of due process and fundamental fairness. Devoid of the protections of due process and fairness, and the constraints that they imposed, the investigation was used to serve the

discriminatory and unlawful motives of the College and Ms. DiCaprio, and not to ascertain the validity of the complaint.

27. The investigator, Eva Jackson, the Director of Employee Relations, was not neutral. She was close friends with the accuser, Ms. Duncan, who was routinely in her office, where they socialized with each other. In fact, upon information and belief, Ms. Jackson was once removed from involvement with disciplinary action against Ms. Duncan because of potential bias, favoritism and lack of impartiality. Ms. Jackson has done the fewest investigations for the College, yet she was selected to lead the investigation of a senior administrator that involved claims brought by a close friend of hers. The lack of impartiality on Ms. Jackson's part casts significant doubts on the proper conduct of the investigation, and the validity of its conclusions.

28. The College's "Discrimination, Harassment, and Sexual Misconduct Policy and Procedures for all Students and Employees" (the "Policy") outlines "The College's Process for Investigating and Resolving Reports of Discrimination, Harassment, Discrimination, and Sexual Misconduct." This "Process" specifically provides that "[b]oth the reporting party and the responding party have the opportunity to review and present relevant evidence and information that will be used during the process, consistent with College policies and procedures and in accordance with the federal, state and local laws involving FERPA." The Process further provides that "[a]t the conclusion of the investigation, the investigator(s) will prepare a report setting forth the facts gathered. Both the reporting party and responding party will simultaneously receive the report to review. Each has an opportunity to edit or offer clarifying information." It continues, "[b]oth the reporting party and the responding party will simultaneously be advised in writing of the outcome, including a written report of the findings, a decision and any sanctions, rationale for

the decision, and information on how to file an appeal." None of these provisions or safeguards were followed in the investigation of Ms. Duncan's allegations against Ms. Cordner.

29.     As part of the investigation, Ms. Cordner was interviewed but, contrary to policy requirements, was not given the opportunity to review and present relevant information during the investigation. This is particularly true with respect to the specific allegations made by unnamed employees in the Office of Accommodations and Accessibility who were interviewed during the investigation. It also applies to unnamed employees from Ms. Cordner's other Departments – Student Health Services, Student Counseling Services and the Office of Student Conduct – who allegedly corroborated the information provided by employees of the Office of Accommodations and Accessibility. Ms. Cordner was never provided any information about these interviews other than a conclusory statement that "they" corroborated allegations raised by employees in the Office of Accommodations and Accessibility. This is critical because: (a) it is not true, and (b) because it became an excuse that allowed the College to follow through with its intent to terminate Ms. Cordner's employment without considering any alternatives, such as allowing her to continue to supervise her other Departments, and remove her only from the Office of Accommodations and Accessibility where the complaint under investigation arose.

30.     The College simply conducted a one-sided investigation, refusing to receive or consider information from Ms. Cordner, which, of course, led to a result that was pre-ordained to be unfavorable to Ms. Cordner. It was an investigation that failed to consider all available evidence, thereby depriving Ms. Cordner of due process and fundamental fairness, and of her right to objectivity.

31.     Ms. Cordner was also not given a copy of the report at the end of the investigation and was not provided an opportunity to review or edit it, or offer clarifying information, as the

Policy required. She was not provided with "a written report of the findings, a decision and any sanctions, rationale for the decision, and information on how to file an appeal," as also required by the Policy.

32. The selection of persons to be interviewed during the investigation also demonstrates improprieties on the part of the College. The original complaint came from an employee from the Office of Accommodations and Accessibility. Ms. Cordner was only supervising this Office as an add-on to her regular duties as Assistant Dean for Student Affairs, responsible for Student Health Services, Student Counseling Services and the Office of Student Conduct. Ms. Cordner spent, at best, two days a week in the Office of Accommodations and Accessibility; most of her time was spent across campus in the student center. Despite this, the College's investigation focused solely on the Office of Accommodations and Accessibility, which was not representative of Ms. Cordner's overall work performance, her interactions with employees, or the environment she maintained in all of her departments.

33. Further, despite the College's claim to Ms. Cordner that it conducted a thorough investigation, upon information and belief, it appears that the College only spoke to 6 of the 18 employees in the Office of Accommodations and Accessibility, a fact that demonstrates that this was not an objective and thorough investigation designed to reach an objective conclusion based on all the facts. Rather, it was an investigation that engaged in cherry picking those employees whom the College, and Ms. DiCaprio, believed would provide favorable information (or information unfavorable to Ms. Cordner) to justify the termination of Ms. Cordner's employment. The College apparently only spoke to those people who had previously expressed concerns about the Department and whose names were likely provided by Ms. Duncan. Ms. Cordner was not afforded the opportunity to provide witnesses to support her position.

34. It appears that Investigator Jackson interviewed only John Sellmeyer, Diane Hayes, Judy Creedon, Susan Jenkins, Krista Ackert and Barbara Murray. But Mr. Sellmeyer, Ms. Hayes, Ms. Creedon and Ms. Murray do not report directly to Ms. Cordner, and may have had only indirect knowledge about Ms. Cordner's leadership of the Office of Accommodations and Accessibility. Most significantly, the Associate Director and Office Manager, who worked most directly with Ms. Cordner and knew most about the day to day operations of the office and about Ms. Cordner's work, were not interviewed as part of the investigation. Upon information and belief, the Office Manager even took the affirmative step of going directly to Human Resources to provide information about the claims made against Ms. Cordner. She intended to dispute the allegations made against Ms. Cordner and provide an accurate picture of the office environment. But Investigator Jackson apparently refused to speak with her as part of the investigation. In the rush to judgment (a pre-determined biased judgment), Investigator Jackson chose to ignore relevant information because it did not fit her pre-determined narrative and conclusions.

35. Moreover, two of the six persons interviewed were good friends with Ms. DiCaprio. This appears to be typical in this investigation where there were several close personal relationships among some of the players. Those personal relationships infected the investigation and appeared to define the sides taken by many of the individuals – either for Ms. DiCaprio or for Ms. Cordner based on personal allegiances and not on facts specifically related to the workplace.

36. Ms. Creedon was close friends with Ms. DiCaprio and Ms. DiCaprio was instrumental in her hiring. Ms. Murray was a part-time employee who is the wife of the College's Athletic Director, and was close friends with, and reported to Ms. DiCaprio. Ms. Murray and her husband had a prior issue with Ms. Cordner in connection with a prior disciplinary action involving a family member. Ms. Murray was the only part-time employee spoken to as part of the

investigation. It may not have been surprising, but it was disturbing that Ms. Jackson decided to interview the only part-time employee, who just happened to be friends with Ms. DiCaprio, and was already biased against Ms. Cordner. As Ms. DiCaprio's allies and friends, it is also not surprising that Ms. Creedon and Ms. Murray would cast aspersions on Ms. Cordner. Their negative opinions do not appear to have been shared by anyone else, other than Ms. Duncan, whose allegations were dated and arguably manufactured or solicited (given the suspicious timing of Ms. Duncan's complaint).

37. Ms. Cordner specifically asked if anyone outside of the Office of Accommodations and Accessibility was asked about the allegations. The College responded vaguely that people in every office in which Ms. Cordner worked or supervised was spoken to (as noted above), and everyone corroborated the allegations made by employees of the Office of Accommodations and Accessibility. This was simply not true. Upon information and belief, no one from Student Health Services, Student Counseling Services and the Office of Student Conduct (the offices where Ms. Cordner worked the majority of her time) was interviewed. This was hardly indicative of a thorough and objective investigation. Rather, it indicated a deficient and incomplete investigation that had an agenda to get rid of Ms. Cordner because Ms. DiCaprio wanted young employees working for her. Any information that might interfere with that agenda was not considered during the investigation.

38. If people in every office in which Ms. Cordner worked had been interviewed, they would have painted a far different picture than that advanced by the hand-selected interviewees from the Office of Accommodations and Accessibility. Many of Ms. Cordner's former colleagues came forward to show their support for Ms. Cordner – despite the retaliatory attempts by the College to silence them – and expressed shock and disappointment about the termination decision.

Additionally, Ms. Cordner learned of an anonymous letter that was sent to the President of the College supporting her and challenging the decision to terminate her employment. If everyone had been interviewed and corroborated the allegations against Ms. Cordner (as vaguely claimed by Ms. Jackson), members of the Marist community would not have been denouncing the termination of her employment or writing letters of support to the President.

39. The results of the investigation and the decision to terminate Ms. Cordner's employment ran afoul of the College's own policies and procedures. The College advised Ms. Cordner that it had found that she created a hostile work environment but made it clear that she had not engaged in any discrimination or harassment. This is completely inconsistent with the law and the College's Policy. According to the Policy, "Prohibited Conduct Under this Policy" includes "Harassment" which is defined as "subjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning or campus living environment; that alters the conditions of employment or education; or unreasonably interferes with an individual's work or academic performance on the basis of the individual's membership in a protected class" (emphasis added). The Policy further provides that "[t]he College will remedy all forms of harassment when reported, whether or not the harassment rises to the level of creating a hostile work environment." By its own terms, there is no way that Ms. Cordner's alleged conduct, even if true, rose to the level of a hostile work environment because the College conceded that she did not engage in any discriminatory behavior.

40. It is also doubtful that Ms. Cordner created a hostile work environment for Ms. Duncan when the alleged conduct that Ms. Duncan complained about occurred four years in the past, in 2015 (which should have made the 2019 complaint untimely as a matter of law), yet she continued to work in the Office of Accommodations and Accessibility for another four years

without complaint and without asking for a transfer. Throughout that time, Ms. Duncan regularly met with Ms. Cordner to seek advice on personal issues, and to discuss work-related items. The facts demonstrate that Ms. Cordner did not create a hostile work environment for Ms. Duncan or anyone else. Rather, Ms. Duncan's alleged complaint was encouraged or manufactured as a pretext to cover up the bias and the discriminatory reasons for the termination of Ms. Cordner's employment. It was a smokescreen designed to hide the discriminatory animus manifested by Ms. DiCaprio and the College.

41.    The Policy addresses the situation in which alleged harassment does not rise to the level of discrimination: "The College reserves the right to address offensive conduct and/or harassment that does not rise to the level of discrimination or that is of a generic nature not on the basis of a protected status, and which customarily may not result in the imposition of discipline under College policy." Recognizing the fundamentally different and less severe nature of this non-discriminatory and non-hostile conduct, the Policy provides that, rather than through discipline, this type of conduct will be addressed through "civil confrontation, remedial actions, education and/or effective conflict resolution mechanisms." None of these mechanisms were utilized here because any remediation or resolution would not have served the College's purpose of carrying out Ms. DiCaprio's discriminatory scheme to get rid of Ms. Cordner because of her age.

42.    Ms. Cordner's employment was summarily terminated without resort to: (1) any confrontations, civil or otherwise, between her and her accuser; (2) remedial actions short of termination, such as suspension, written warning, or transfer out of that office; (3) education and/or training; or (4) effective conflict resolution techniques. Instead, there was a rush to judgment to get rid of Ms. Cordner because Ms. DiCaprio did not like her and wanted her out so she could replace her with younger staff, which is presumed to have been her plan, as she had articulated

since at least June 2019. In condoning and acquiescing in Ms. DiCaprio's plan, the College violated the law and completely disregarded its own policies and procedures, all of which indicated pretext in these circumstances.

43. As a result of the conduct described above, Ms. Cordner suffered significant economic and non-economic damages, and is entitled to reinstatement to her position at the College as well as compensation for her damages and the harm she has suffered. Pursuant to the statutes that form the bases for Ms. Cordner's claims, she is entitled to compensatory damages, including back pay and lost benefits, front pay, damages for mental and emotional distress, liquidated and punitive damages, attorneys' fees and interest.

## FIRST CAUSE OF ACTION
*Termination of Plaintiff's Employment in Violation of the ADEA Against Marist College*

44. Plaintiff realleges and incorporates all allegations in the preceding paragraphs.

45. The ADEA makes it unlawful for any employer to discharge any individual because of that individual's age. 29 U.S.C. § 623(a).

46. Plaintiff was nearly 67 years old at the time Defendants terminated her employment because of her age and was in a protected age category under ADEA.

47. In terminating Plaintiff's employment because of her age, Defendant Marist College violated the ADEA.

48. In terminating Plaintiff's employment, Defendant Marist College implemented the express intent and plan of Defendant Deborah DiCaprio, its Vice President and Dean for Student Affairs, to get rid of older employees in order to replace them with younger individuals.

49. Defendant Marist College's actions in terminating Plaintiff's employment because of her age were intentional and willful.

50. As a result of the foregoing violations of the ADEA, Plaintiff sustained economic and non-economic damages, including but not limited to lost wages and other employment benefits and privileges, and compensatory damages.

51. Defendants' conduct was willful, wanton and egregious, and, therefore, Plaintiff is entitled to liquidated damages.

## SECOND CAUSE OF ACTION
*Termination of Plaintiff's Employment in Violation of the NYSHRL*
*Against Marist College and Deborah DiCaprio*

52. Plaintiff realleges and incorporates all allegations in the preceding paragraphs.

53. The NYSHRL makes it unlawful for any employer to discharge any individual because of that individual's age. NY Executive Law § 296(1)(a).

54. Plaintiff was nearly 67 years old at the time Defendants terminated her employment because of her age and was in a protected age category under the NYSHRL.

55. In terminating Plaintiff's employment, Defendant Marist College encouraged, condoned, acquiesced and participated in the express intent and plan of Defendant Deborah DiCaprio, its Vice President and Dean for Student Affairs, to get rid of older employees in order to replace them with younger individuals.

56. In terminating Plaintiff's employment because of her age, Defendant Marist College and Defendant DiCaprio violated the NYSHRL.

57. The actions of Defendant Marist College and Defendant DiCaprio in terminating Plaintiff's employment because of her age were intentional and willful.

58. As a result of the foregoing violations of the NYSHRL, Plaintiff sustained economic and non-economic damages, including but not limited to lost wages and other employment benefits and privileges, and compensatory damages.

59. Defendants' conduct was willful, wanton and egregious, and, therefore, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff prays for the following relief:

A. Issuance of a declaratory judgment that the practices complained of in this Complaint are unlawful under the ADEA and the NYSHRL;

B. An award of lost wages, employment benefits and other lost compensation as a result of Defendants' discrimination against Plaintiff on the basis of her age;

C. Reinstatement to Plaintiff's position (or a comparable position) and back pay or, alternatively, an award of front pay until the date on which Plaintiff intended to resign from her position;

D. An award of liquidated damages, compensatory and punitive damages;

E. Pre-judgment interest;

F. Attorneys' fees and costs; and

G. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues in this action properly triable before a jury.

Dated: White Plains, New York
November 16, 2020

                                                **SAPIR SCHRAGIN LLP**

By: _____
       Howard Schragin, Esq.
       Ann L. Moscow, Esq.
       399 Knollwood Road, Suite 310
       White Plains, New York 10603
       (914) 328-0366
       Email: hschragin@sapirschragin.com
              amoscow@sapirschragin.com
       *Attorneys for Plaintiff*